UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CURTIS HARRIS,

    Plaintiff,

v.

Case No. 5:05-cv-113
Hon. Gordon J. Quist

DR. RODNEY L. KILPATRICK,
RICK BOOKHEIMER, CHRISTINA FORREST,
DONNA ALLMON, MARY SCHIEBNER,
and JOHN DOE NURSE,

    Defendants.
_____/

## REPORT AND RECOMMENDATION

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. Plaintiff seeks compensatory and punitive damages against defendants. This matter is before the court on the motion for summary judgment filed by defendants Forrest, Allmon, Scheibner and Bookheimer (docket no. 64), plaintiff's motion for partial summary judgment against defendants Forrest, Scheibner and Allmon (docket no. 48), plaintiff's motion for partial summary judgment against defendant Bookheimer (docket no. 54), and plaintiff's "Motion for Fed. Rule Civ. P. 56(f) for additional discovery" (docket no. 78).

    **I.**    **Background**

In June, 2004, plaintiff was incarcerated at the Oaks Correctional Facility. On June 8, 2004, he was sent to the emergency room at the West Shore Medical Center in Manistee, MI, where a CT scan indicated that he had "a subarachnoid hemorrhage most likely from an aneurysm in the circulation to his brain." *See* Emergency Department Report (June 8, 2004) (docket 50-2).

He was transferred to Spectrum Health - Blodgett Campus in Grand Rapids, MI, where he underwent surgery on June 9, 2004. *See* Medical Records (attachments U - Y) (docket no. 69).

In the present civil rights action, plaintiff claims that defendants were deliberately indifferent to this serious medical condition prior to his admission to the hospital. Plaintiff makes the following allegations. On December 30, 2003, he suffered a bad headache, numbness and paralysis in his legs and back. Amend. Compl. at p. 2. At that time, defendant Nurse Forrest used her "unsuitable and unsanitary name tag" to stick his feet and ask him what he felt. *Id.* at 2. Forrest then stated "I know your game! Ain't nothing wrong with you." *Id.* Plaintiff alleges that he was left untreated and that it took four hours for him to feel his body parts. *Id.* at 3.

On January 9, 2004, plaintiff sent in a health care request regarding complaints in his lower back, headache and legs. *Id.* at 3. On January 13, non-defendant Nurse Briske sent him pamphlets about headache and back pain. *Id.* He was not examined at that time. *Id.* at 4. Plaintiff makes no further allegations of any conduct until June 2004.

Plaintiff alleges that he "had a brain aneurysm rupture" sometime after 10:45 a.m. on June 2, 2004 and that the left side of his body was completely numb and paralyzed. *Id.* Nurse Forrest arrived at the examination room and plaintiff related the following symptoms, "I felt a severe pain that had an extreme pressure that lasted about eight seconds, then felt a powerful blow to the back of my head, my whole left side is paralysis [sic] and numb, I have a headache that is beyond belief, very poor vision, nausea, weakness, neck stiffness and I feel like vomiting." *Id.* Defendants Officer Schiebner and RUM Allmon arrived a few minutes later and spoke to Nurse Forrest. *Id.* Defendant Dr. Kilpatrick arrived about 35 minutes later. *Id.*

Plaintiff alleged that he told the doctor and nurse that "I had a stroke and I need to get to a hospital before I die." *Id.* Officer Scheibner and RUM Allmon stood at the door of the examining room and stated, "Mr. Harris is faking and playing games" and told the doctor that nothing like this had ever happened before. *Id.* at 5. Nurse Forrest allegedly stated, "I know your game. You are faking! Ain't nothing wrong with you!" *Id.* Plaintiff told the doctor, "my legs and lower back went paralysis [sic] and numb and I had a headache but nothing this [sic], I'm sure I had a stroke and I need to get to the hospital before I die." *Id.* The doctor sent plaintiff back to his cell. *Id.*

Later that afternoon, plaintiff told "John Doe Nurse" what happened and that he had been vomiting all day. *Id.* at 5. The nurse brought him medication for pain and his stomach. *Id.* at 6. Plaintiff later identified one of the "John Doe Nurses" as defendant Nurse Bookheimer. *See* letter (docket no. 26).

On June 3rd, non-party Officer Busch observed that plaintiff was "seriously sick," and removed him from his cell to clean up the vomit. Amend. Compl. at 6.

On June 5th, non-party Nurse Briske woke up plaintiff to give him medications for his pain and stomach. *Id.* At that time plaintiff struggled to get to the door exhibiting "very bad awareness, sluggishness, clumsiness, severe headache, brief blackouts, confusion, vision, speech problems, nausea, [vomiting], jerking movements, weakness, neck stiffness, and numbness in [his] head, face, arms, hands, hips, back, legs and feet." *Id.* He "was going blind in both eyes," his right eye was severely swollen and his right eye pupil was enlarged. *Id.* Plaintiff told Nurse Briske that he had a stroke and needed to get to a hospital. *Id.* The nurse said she would put plaintiff on the

doctor's list. *Id.* Later that afternoon, Dr. Kilpatrick examined plaintiff in the presence of Officer Scheibner. *Id.* at 6-7. The doctor made jokes about his swollen eye and Schiebner laughed. *Id.*

On June 7th, plaintiff states that he was brought to the doctor by several officers and "John Doe Nurses" *Id.* The nurses told him he had a bad case of the flu, gave him no medication and left him to die. *Id.* at 12-13. Plaintiff alleges that "[t]hese officials were never in good faith." *Id.* at 13. On the evening of June 8th, he was found unconscious and rushed to the emergency room. *Id.* at 13.

Plaintiff claims that defendants were deliberately indifferent because: (1) he was never seen or examined by a nurse on December 30, 2003; and, (2) his visits with health care providers on December 29 and 30, 2003, January 9, 2004, June 2, 2004, June 5, 2004 and June 7, 2004, demonstrated a pattern of inadequate medical care where "[o]fficials deliberately [did] nothing for a serious medical need." Amend. Compl. at 9.

### II.     Legal Standard

Plaintiff and defendants have filed cross-motions for summary judgment pursuant to Fed. Rules Civ. Proc. 56(b). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support

4

> plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### III. Discussion

#### A. Failure to exhaust administrative remedies

As an initial matter, defendants contend that plaintiff has failed to exhaust his administrative remedies. The Prison Litigation Reform Act ("PLRA") 42 U.S.C. § 1997e, provides that a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust available administrative remedies. *See Porter v. Nussle*, 534 U.S. 516 (2002); *Booth v. Churner*, 532 U.S. 731 (2001). The exhaustion requirement is mandatory and applies to all suits regarding prison conditions, regardless of the nature of the wrong or the type of relief sought. *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741. A district court must enforce the exhaustion requirement sua sponte. *Brown v. Toombs*, 139 F.3d 1102, 1104 (6th Cir.) (1998); *accord Wyatt v. Leonard*, 193 F.3d 876, 879 (6th Cir. 1999). The exhaustion requirement, while not jurisdictional, is mandatory and must be addressed in the first instance by the district court in all prisoner civil rights cases before the merits of the case are addressed. *See Curry v. Scott*, 249 F.3d 493, 501 n.2 (6th Cir. 2001); *Wyatt*, 193 F.3d at 879; *Brown*, 139 F.3d at 1104.

Defendants contend that plaintiff failed to exhaust his remedies, because the copies of the Step I grievance forms submitted by plaintiff "cannot be read." Defendants' Reply at 2. The court directed defendants to submit legible copies of the grievances. Upon reviewing defendants'

5

copies of the grievances, the court concludes that plaintiff exhausted his claims with respect to the defendants named in this suit. *See* Grievance ECF 2005-03-0549-28E (docket nos. 69, 90-3). Accordingly, defendants are not entitled to summary judgment on this ground.

### B.     Plaintiff's motion for additional discovery

Next, plaintiff seeks additional discovery to respond to defendants' motion for summary judgment. Fed. Rules Civ. Proc. 56(f) provides as follows:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Rule 56(f). To obtain relief under Rule 56(f), a party must comply with the procedural requirement of filing an affidavit stating the reasons for relief and indicate in that affidavit "its need for discovery, what material facts it hopes to uncover, and why it has not previously discovered the information." *Cacevic v. City of Hazel Park*, 226 F.3d 483, 488 (6th Cir. 2000).

Plaintiff states that defendants have not complied with his request for production of documents. This is an insufficient basis to delay consideration of defendants' motion for summary judgment. The only material fact identified in plaintiff's motion is the identity of an unknown John Doe defendant. However, this is an insufficient ground to allow additional discovery, because defendants' motion for summary judgment does not involve a "John Doe" defendant. Furthermore, while plaintiff contends that he needs to "narrow down" the evidence in this case, the court notes that plaintiff had sufficient evidence to file two motions for partial summary judgment <u>before</u> defendants

6

filed their motion. *See* docket nos. 48 and 54. In addition, plaintiff has responded to defendants' motion for summary judgment by filing copies of various medical records, including two factual "declarations" in opposition to the motions. *See* docket nos. 49 and 55. Plaintiff has not met his burden under Rule 56(f). Accordingly, his motion for additional discovery (docket no. 78) should be denied.

### C. Plaintiff's Eighth Amendment claims

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under 42 U.S.C. § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective component requires a plaintiff to "allege that the medical need is 'sufficiently serious.'" *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001), *quoting Farmer*, 511 U.S. at 834. The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, deliberate indifference, the

7

plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. Thus,

> a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle*, 429 U.S. at 106. "[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock*, 273 F.3d at 703. *See Clemmons v. Bohannon*, 956 F.2d 1523, 1529 (10th Cir. 1992) ("the Eighth Amendment does not apply to claims based on inadvertent failure to provide adequate care, negligent misdiagnosis, or an inmate's difference of opinion with medical personnel regarding diagnosis or treatment"). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cit. 1976). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize

8

claims which sound in state tort law." *Id.* However, in some cases, the medical attention may be so "woefully indaequate" as to amount to no treatment at all. *Id. See Terrance v. Northville Regional Psychiatric Hospital*, 286 F.3d 834, 844 (6th Cir. 2002) (when a medical condition poses a serious need for treatment, the question for the court is whether the care provided was so grossly incompetent, inadequate, or excessive as to shock the conscious or to be intolerable to fundamental fairness) (internal quotations omitted).

### 1. The December 30, 2003 incident

Plaintiff contends that defendant Forrest was deliberately indifferent to his serious medical need on December 30, 2003. Plaintiff alleged when he suffered numbness and paralysis, Nurse Forrest simply removed her name tag and "did in fact stick [plaintiff's] feet with [the] name tag several times," stated "Ain't nothing wrong with you, I know your game," and directed officers to place plaintiff in his cell to suffer with no medical treatment. Plaintiff's Declaration at ¶¶ 3-5 (docket no. 49).[1] Nurse Forrest denies that she made the statement attributed to her. Forrest Aff. at ¶ 8 (docket no. 72). Both the medical records and defendant Forrest's affidavit indicate she used her name tag to test plaintiff for paralysis or other neurological disorders, i.e., to check plaintiff's feet for Babinski's reflex. Forrest Aff. at ¶ 6; Medical Record (12/30/04) (docket no. 50). The test indicated that plaintiff had normal plantar reflexes. Forrest Aff. at ¶ 6.

To prevail on the objective component of his Eighth Amendment claim, plaintiff must show a sufficiently serious medical need. *Farmer*, 511 U.S. at 834; *Comstock*, 273 F.3d at 702.

---

[1] Plaintiff did not submit an affidavit as prescribed under Fed. Rules Civ. Proc. 56(e). Plaintiff has submitted two documents, each entitled "Declaration in support of plaintiff's motion for partial summary judgment" (docket nos. 49, 55). In each "declaration," plaintiff recites facts under penalty of perjury pursuant to 28 U.S.C. § 1746. The court will refer to docket no. 49 as "Declaration I" and docket no. 55 as "Declaration II."

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). While plaintiff claims that he had a serious medical need on that date, the record contains no objective evidence of such a need.

Furthermore, Nurse Forrest did not act with deliberate indifference. Plaintiff admits that she "stuck" his feet with her name tag. Nurse Forrest's affidavit establishes that her use of the name tag was, in fact, an examination. Nurse Forrest found negative results and ordered plaintiff back to his cell. At most, there is a disagreement between plaintiff and nurse Forrest regarding the scope of her examination. To the extent that plaintiff's claim is based upon a difference in opinion between plaintiff and prison medical staff about medical treatment, the claim does not amount to deliberate indifference. *McDonald-El v. Anthony*, No. 92-2346, 1993 WL 210683 (6th Cir. June 15, 1993). *See also, Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir.1988) (deliberate indifference cannot be maintained on mere negligence, rather "it must demonstrate deliberateness tantamount to an intent to punish"). Accordingly, plaintiff has failed to state a claim against Nurse Forrest with respect to the claim arising from December 30, 2003.

### 2. Plaintiff's treatment from June 2, 2004 through June 8, 2004

Next, plaintiff contends that his treatment from June 2, 2004 through June 8, 2004 demonstrates a pattern of inadequate medical care where "[o]fficials deliberately [did] nothing for a serious medical need." Amend. Compl. at 9. In his declarations, plaintiff states that he reported headaches, experienced vomiting, had flu-like symptoms and claimed to have some paralysis prior to the detection of the aneurysm on June 8th. This evidence, viewed in the light most favorable to

plaintiff, indicates that he had a medical need sufficiently serious to meet the objective component of an Eighth Amendment claim. *See Farmer*, 511 U.S. at 834; *Comstock*, 273 F.3d at 702.

The question before the court is whether defendants acted with deliberate indifference, i.e., that they knew of and disregarded an excessive risk to plaintiff's health or safety. *Farmer*, 511 U.S. at 837. To demonstrate deliberate indifference, plaintiff must show that each defendant was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and that each defendant drew that inference. *Id.* After reviewing the pleadings, affidavits, declarations and medical records, the court concludes that plaintiff has failed to establish that these four defendants were deliberately indifferent.

In his complaint and declarations, plaintiff claims that he received medical treatment on June 2, 2004, June 5, 2004 and June 7, 2004. The medical records, which were generated by the medical providers (including both defendants and non-defendants) indicate that plaintiff was treated on the following dates and times: June 2, 2004 (12:55 p.m., 4:17 p.m., and 8:39 p.m.); June 3, 2004 (1:51 p.m., 3:09 p.m. and 4:54 p.m.); June 4, 2004 (11:07 a.m., 2:08 p.m., 6:15 p.m. and 8:00 p.m.); and, June 7 (7:46 a.m., 7:00 p.m., 9:00 p.m. and 9:20 p.m.). *See* Medical Records (docket no. 67).

On June 2, 2004, at 12:55 p.m., non-party Nurse Swickley came to plaintiff when he was lying on the floor yelling "emergency" and brought him to the clinic. *Id.* The nurse noted that plaintiff had an unsteady gait. *Id.* Plaintiff complained of a sudden onset of "the worst headache [he] ever had," with dizziness, blurred vision, vertigo, nausea, sensitivity to light. *Id.* Plaintiff denied that he had ever had these symptoms before. *Id.* The medical service provider (MSP) was notified of plaintiff's condition. *Id.* At 4:17 p.m., Dr. Kilpatrick examined plaintiff, found him normal, and listed two preliminary considerations of his condition: (1) "Possible Headache" with

11

"[n]o sign of CVA;" and (2) "Fictitious LLE Weakness." *Id.*[2] At 8:39 p.m., Nurse Bookheimer noted that plaintiff vomited and had left leg numbness. *Id.* The nurse examined plaintiff, gave him medications (Pepto Bismal and Tbylenol) and told him to contact the Health Center if his symptoms worsened. *Id.* At

On June 3, 2004, at 1:51 p.m., plaintiff complained to non-party Nurse Jensen that he had a headache and nausea and was not eating. *Id.* The nurse found plaintiff's gait steady and that he had no deficits and his speech was clear. *Id.* She received orders to give him Toradol.[3] *Id.* At 3:09 p.m. the nurse spoke to plaintiff on the phone. *Id.* He reported little relief from the injection and that he vomited again. *Id.* Nurse Jensen made the doctor aware of plaintiff's status. *Id.* Dr. Kilpatrick examined plaintiff at 4:54 p.m. *Id.* He found that plaintiff was a "hard inmate to evaluate": plaintiff stated that the Toradol gave no relief, that Imitrex had given some relief, that both the p.m. nurses thought plaintiff looked better, and that there were "[n]o neuro deficits." *Id.* The doctor's assessment included a headache and the following possibilities: "Viral flu vs migraine vs intracranial etiology (aneurysm??)". *Id.* The doctor listed the following plan: "Try Imitrex for 3 days. Get Head MRI w/contrast if worsens. RN's to check on him per shift." *Id.* The records reflect that plaintiff was prescribed two tablets of Imitrex, three times per day for three days. *Id.*

On June 4th, non-party Nurse Jensen examined plaintiff at 11:30 a.m., found that plaintiff had no relief from medication, had a "stiff neck appearance" but was alert and oriented. *Id.* Dr. Kilpatrick examined plaintiff at 2:08 p.m. *Id.* Plaintiff reported that he lifted his head

---

[2] "CVA" is defined as a cerebrovascular accident. *Dorland's Illustrated Medical Dictionary* (28th Ed.) at 409. "LLE" is a commonly used abbreviation for left lower extremity.

[3] "Toradol" is used for the short-term management of moderately severe acute pain. Physician's Desk Reference at 2508 (52nd ed. 1998).

quickly while making the bed and felt an "electric shock" on his head. *Id.* Plaintiff still reported a headache. *Id.* The doctor found plaintiff alert and looking better, but anxious and afraid, fearing a tumor or aneurysm. *Id.* The doctor believed plaintiff had greater occipital nerve pinch. *Id.* However, his preliminary diagnosis included (1) "Greater Occipital Neuralgia" and (2) "Intracranial Aneurysm???" *Id.* The doctor noted that plaintiff's history was compatible with his presentation, added Ultram and Tigan for the pain and nausea. *Id.* The doctor also included an "MRI brain w/contrast asap" if plaintiff's condition worsened. *Id.*

Nurse Bookheimer examined plaintiff at 6:15 p.m. but observed little improvement *Id.* He visited plaintiff at 8:00 p.m., at which time plaintiff stated that he felt much better and smiled. *Id.* Plaintiff was instructed to keep drinking fluids and to contact the Health Center immediately if symptoms increased. *Id.*

Neither plaintiff nor defendant have provided medical records for June 5th or 6th (Saturday and Sunday). For his part, plaintiff contends that he was examined by Dr. Kilpatrick on June 5th, that he was not seen by the doctor on June 4th and that the medical records were deliberately altered to show the wrong date. Plaintiff's Declaration I at ¶ 14. Plaintiff's uncorroborated assertion that Dr. Kilpatrick intentionally altered his medical records to reflect a date of June 5th rather than June 4th appears incredible, in light of other medical records which reflect that the doctor prescribed Tigan and Ultram on that date. *See* Medical Records (sealed).

Plaintiff did not allege any medical problems or interaction with health care providers on June 6th.

The medical records reflect that on June 7th, at 7:46 a.m., non-party Nurse Briske observed that plaintiff's right eyelid was swollen shut. *Id.* Plaintiff reported that his headache

13

continued without relief but there was no report of vomiting. *Id.* Nurse Briske noted that "[c]ustody reports inmate monitored by day RN during weekend [i.e., June 5th and 6th]." *Id.* Later that night, Nurse Bookheimer examined plaintiff at 7:00 p.m., noting that his right eyelid was swollen. *Id.* Plaintiff reported that he felt somewhat better, was eating meals, and answered questions appropriately. *Id.* Plaintiff was instructed to place a cold compress on his eye. *Id.* At 9:00 p.m., plaintiff told the nurse that he did not need to see him. *Id.* Then, at 9:20 p.m., plaintiff was reported to be lying on the floor unresponsive. *Id.* Nurse Bookheimer examined plaintiff and sent him to the hospital via ambulance. *Id.*

### a. **Officers Allmon and Schiebner**

Neither of these defendants provided plaintiff with medical care. Plaintiff alleges that that defendants Allmon and Schiebner told the doctor that plaintiff was "faking" on June 2nd and that Schiebner laughed about plaintiff's swollen right eye at the alleged June 5th examination. In her affidavit, Officer Allmon denies that she was in the examination room or that she said plaintiff was faking. Allmon Aff. (docket no. 73). In her affidavit, Scheibner denies: that she was in the health care room with the doctor; that the doctor made jokes about plaintiff's eye; and that she laughed at the doctor's jokes. Schiebner Aff. at ¶ 8 (docket no. 74). Plaintiff states that Dr. Kilpatrick examined him on June 5th and that his eyes were swollen at that time. Declaration I at ¶ 15. Plaintiff's declaration does not dispute Schiebner's affidavit, other than to state that "Mary Schiebner was present June 5, 2004." Declaration I at ¶ 15.

At most, plaintiff claims that defendants Allmon and Schiebner said he was faking and that Schiebner laughed about his swollen eye during a doctor's examination. Viewing the facts in the light most favorable to plaintiff, such activity did not violate plaintiff's constitutional rights.

14

A guard's statement that a prisoner appears to be faking a medical condition does not violate that prisoner's Eighth Amendment rights. *See Williams v. Commonwealth of Pennsylvania, Department of Corrections*, 146 Fed. Appx. 554, 557-58 (3rd Cir. 2005) (corrections officer's actions in failing to add prisoner to sick call list and telling other officers that prisoner was faking injuries, "although regrettable, do not rise to the level of a constitutional violation" under the Eighth Amendment). *See also*, *Weaver v. Shadoan*, 340 F.3d 398, 411-12 (6th Cir. 2003) (where pretrial detainee died in custody after ingesting cocaine, police officer's belief that detainee was faking an illness did not support inference that officer acted with deliberate indifference to serious medical needs; "[t]o the contrary, [the officer's] 'faking' statements suggest that he did not draw an inference or have the subjective belief that [the suspect] was in a substantial risk of serious harm'").

Furthermore, neither Allmon nor Schiebner had control of plaintiff's medical treatment. It was the doctor, not the corrections officers, that diagnosed plaintiff and determined his need for medical care.

Accordingly, the court should grant defendants' motion for summary judgment with respect to Allmon and Schiebner.

      **b.**    **Nurse Forrest**

Next, plaintiff alleges that after Dr. Kilpatrick arrived in the examining room on June 2nd, Nurse Forrest accused him of faking, stating: "I know your game. You are faking! Ain't nothing wrong with you!" Amend. Compl. at p. 5. Defendant Forrest denied making these statements. Forrest Aff. at ¶ 20. Assuming, for purposes of this motion, that Nurse Forrest stated that plaintiff was faking, this statement, in and of itself, does not rise to the level of a constitutional violation. *See Williams*, 146 Fed. Appx. at 557-58; *Weaver*, 340 F.3d at 411-12.

Plaintiff presents no evidence that Nurse Forrest was deliberately indifferent to his medical needs. Plaintiff does not allege that Nurse Forrest failed to attend to him. Plaintiff admits that the doctor examined him about 35 minutes after he arrived in the examining room with Nurse Forrest. In her affidavit, Nurse Forrest states that when the doctor arrived, she "stood by the door out of the way," and that she took a "back seat" to the doctor. Forrest Aff. at ¶ 21. Plaintiff does not rebut this statement.

Viewing the facts in the light most favorable to plaintiff, the court concludes that Nurse Forrest was not deliberately indifferent to his serious medical needs. Accordingly, the court should grant Nurse Forrest's motion for summary judgment.

    **c.**    **Nurse Bookheimer**

Next, plaintiff has identified Nurse Bookheimer as one of the "John Doe Nurses." Plaintiff states that on the afternoon of June 2nd, he told Nurse Bookheimer that he had been vomiting, that he had blurred vision, numbness, weakness and nausea, and that he had "a headache that was beyond belief." Declaration II at ¶ 4. Plaintiff states that he told Nurse Bookheimer that "I had a stroke and need to get to a hospital before I die." *Id.* The nurse responded with pain medication and something for his stomach. *Id.* On the afternoon of June 7th, plaintiff stated that he told Nurse Bookheimer and "John Doe Rns" that "I am dying and need to get to a hospital before I die. I had a stroke." *Id.* at ¶ 5. On June 7th, plaintiff's eye was swollen shut, but Nurse Bookheimer and the "John Doe Rns" told him that he had a bad case of the flu. *Id.* at ¶ 6.

In his affidavit, Nurse Bookheimer states that he saw plaintiff at about 6:00 p.m. on June 2nd, that plaintiff reported that he had vomited one time, that he had body ached, and that his left leg numbness was better. Bookheimer Aff. at ¶ 4 (docket no. 75). Nurse Bookheimer gave

16

plaintiff some pepto bismal, told him to consume a liquid diet for 24 hours, told him to contact health care if there were any changes, and placed him on callout to see the day nurse.  *Id.*

Nurse Bookheimer denies that he was the "John Doe Nurse" that saw plaintiff on the afternoon of June 7th, pointing out that there were two male nurses at that time.  *Id.* at ¶ 8.  Nurse Bookheimer did stop by plaintiff's cell at about 7:00 p.m., at which time plaintiff walked to the cell door without difficulty, told the nurse he was feeling much better and had been eating meals.  *Id.* at ¶ 9.  The nurse states that plaintiff's right eyelid was swollen and that he told plaintiff to apply cool compresses to it.  *Id.* at ¶ 9.  Nurse Bookheimer checked on plaintiff later during the shift, noting no drainage or discharge from the eye.  *Id.* at ¶ 10.  The nurse checked on plaintiff at about 9:00 p.m., at which time plaintiff did not want to see him.  *Id.* at ¶ 11.  Plaintiff was placed on the call out list for the next day.  *Id.*

Viewing the facts in the light most favorable to plaintiff, the court concludes that Nurse Bookheimer was not deliberately indifferent to plaintiff's serious medical needs.  Plaintiff and the nurse disagree with respect to the content of the conversations that occurred on June 2nd and 7th. However, assuming that plaintiff told the nurse that he had a stroke and wanted to go to the hospital, Nurse Bookheimer's actions do not demonstrate deliberate indifference.  The interaction between plaintiff and Nurse Bookheimer indicate a difference in opinion between plaintiff and prison medical staff about a diagnosis (i.e., bad case of the flu versus stroke) and medical treatment (i.e., remain at the prison versus go to the hospital).  Nurse Bookheimer and the other medical staff monitored plaintiff's condition since the events of June 2nd.  Even if the nurse treated plaintiff for a severe case of the flu,  a  misdiagnosis is evidence of negligence, not a constitutional claim.  *See Estelle*, 429 U.S. at 106; *Comstock*, 273 F.3d at 703.  A difference of opinion between a prisoner and prison

17

medical staff about medical treatment does not amount to deliberate indifference. *See Clemmons*, 956 F.2d at 1529; *McDonald-El*, 1993 WL 210683; *Molton*, 839 F.2d at 243.

The record does not support a claim of deliberate indifference against Nurse Bookheimer. Accordingly, the court should grant his motion for summary judgment.

### IV. RECOMMENDATION

I respectfully recommend that plaintiff's motion for additional discovery (docket no. 78) be **DENIED**, that defendants' Forrest, Allmon, Schiebner and Bookheimer's motion for partial summary judgment (docket no. 64) be **GRANTED,** and that plaintiff's motions for partial summary judgment against these defendants (docket nos. 48 and 54) be **DENIED**.


Dated: June 6, 2006                           /s/ Hugh W. Brenneman, Jr.
                                              Hugh W. Brenneman, Jr.
                                              United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within ten (10) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).