UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CURTIS HARRIS,

    Plaintiff,

v.

Case No. 5:05-cv-113
Hon. Gordon J. Quist

DR. RODNEY L. KILPATRICK, *et al.*,

    Defendants.

_____/

## REPORT AND RECOMMENDATION

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. Plaintiff seeks compensatory and punitive damages against defendants. This matter is before the court on defendant Dr. Kilpatrick's motion for summary judgment (docket no. 109) and plaintiff's motion for summary judgment against defendant Dr. Kilpatrick (docket no. 112).

    **I.**    **Background**

The court provided the following background in its previous report and recommendation:

> In June, 2004, plaintiff was incarcerated at the Oaks Correctional Facility. On June 8, 2004, he was sent to the emergency room at the West Shore Medical Center in Manistee, MI, where a CT scan indicated that he had "a subarachnoid hemorrhage most likely from an aneurysm in the circulation to his brain." *See* Emergency Department Report (June 8, 2004) (docket 50-2). He was transferred to Spectrum Health - Blodgett Campus in Grand Rapids, MI, where he underwent surgery on June 9, 2004. *See* Medical Records (attachments U - Y) (docket no. 69).
>
> In the present civil rights action, plaintiff claims that defendants were deliberately indifferent to this serious medical condition prior to his admission to the hospital. Plaintiff makes the following allegations. On December 30, 2003, he suffered a bad headache, numbness and paralysis in his legs and back. Amend. Compl. at p. 2. At that time, defendant Nurse Forrest used her "unsuitable and

unsanitary name tag" to stick his feet and ask him what he felt. *Id.* at 2. Forrest then stated "I know your game! Ain't nothing wrong with you." *Id.* Plaintiff alleges that he was left untreated and that it took four hours for him to feel his body parts. *Id.* at 3.

On January 9, 2004, plaintiff sent in a health care request regarding complaints in his lower back, headache and legs. *Id.* at 3. On January 13, non-defendant Nurse Briske sent him pamphlets about headache and back pain. *Id.* He was not examined at that time. *Id.* at 4. Plaintiff makes no further allegations of any conduct until June 2004.

Plaintiff alleges that he "had a brain aneurysm rupture" sometime after 10:45 a.m. on June 2, 2004 and that the left side of his body was completely numb and paralyzed. *Id*. Nurse Forrest arrived at the examination room and plaintiff related the following symptoms, "I felt a severe pain that had an extreme pressure that lasted about eight seconds, then felt a powerful blow to the back of my head, my whole left side is paralysis [sic] and numb, I have a headache that is beyond belief, very poor vision, nausea, weakness, neck stiffness and I feel like vomiting." *Id.* Defendants Officer Schiebner and RUM Allmon arrived a few minutes later and spoke to Nurse Forrest. *Id.* Defendant Dr. Kilpatrick arrived about 35 minutes later. *Id.*

Plaintiff alleged that he told the doctor and nurse that "I had a stroke and I need to get to a hospital before I die." *Id.* Officer Scheibner and RUM Allmon stood at the door of the examining room and stated, "Mr. Harris is faking and playing games" and told the doctor that nothing like this had ever happened before. *Id.* at 5. Nurse Forrest allegedly stated, "I know your game. You are faking! Ain't nothing wrong with you!" *Id.* Plaintiff told the doctor, "my legs and lower back went paralysis [sic] and numb and I had a headache but nothing this [sic], I'm sure I had a stroke and I need to get to the hospital before I die." *Id.* The doctor sent plaintiff back to his cell. *Id.*

Later that afternoon, plaintiff told "John Doe Nurse" what happened and that he had been vomiting all day. *Id.* at 5. The nurse brought him medication for pain and his stomach. *Id.* at 6. Plaintiff later identified one of the "John Doe Nurses" as defendant Nurse Bookheimer. *See* letter (docket no. 26).

On June 3rd, non-party Officer Busch observed that plaintiff was "seriously sick," and removed him from his cell to clean up the vomit. Amend. Compl. at 6.

On June 5th, non-party Nurse Briske woke up plaintiff to give him medications for his pain and stomach. *Id.* At that time plaintiff struggled to get to the door exhibiting "very bad awareness, sluggishness, clumsiness, severe headache, brief blackouts, confusion, vision, speech problems, nausea, [vomiting], jerking movements, weakness, neck stiffness, and numbness in [his] head, face, arms, hands,

hips, back, legs and feet." *Id.* He "was going blind in both eyes," his right eye was severely swollen and his right eye pupil was enlarged. *Id.* Plaintiff told Nurse Briske that he had a stroke and needed to get to a hospital. *Id.* The nurse said she would put plaintiff on the doctor's list. *Id.* Later that afternoon, Dr. Kilpatrick examined plaintiff in the presence of Officer Scheibner. *Id.* at 6-7. The doctor made jokes about his swollen eye and Schiebner laughed. *Id.*

On June 7th, plaintiff states that he was brought to the doctor by several officers and "John Doe Nurses" *Id.* The nurses told him he had a bad case of the flu, gave him no medication and left him to die. *Id.* at 12-13. Plaintiff alleges that "[t]hese officials were never in good faith." *Id.* at 13. On the evening of June 8th, he was found unconscious and rushed to the emergency room. *Id.* at 13.

Plaintiff claims that defendants were deliberately indifferent because: (1) he was never seen or examined by a nurse on December 30, 2003; and, (2) his visits with health care providers on December 29 and 30, 2003, January 9, 2004, June 2, 2004, June 5, 2004 and June 7, 2004, demonstrated a pattern of inadequate medical care where "[o]fficials deliberately [did] nothing for a serious medical need." Amend. Compl. at 9.

Report and Recommendation at pp. 1-4 (docket no. 100).

## II. Legal Standard

Plaintiff and defendant Kilpatrick have filed cross-motions for summary judgment pursuant to Fed. Rules Civ. Proc. 56(b). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

### III.   Three Strikes claim

As an initial matter, defendant Dr. Kilpatrick contends that plaintiff is in violation of the "three strikes" rule, 28 U.S.C. § 1915, because plaintiff had three cases dismissed after he filed the present complaint. Defendant seeks to revoke plaintiff's *in forma pauperis* status for this alleged violation of the three strikes rule. The court declines defendant's request.

Section 1915 provides in pertinent part that:

> In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). "Prior to service of the complaint, as part of the initial review process and when *in forma pauperis* status is requested, the court determines whether a prisoner has three strikes." *Harris v. Oatley*, No. 2:05-cv-265, 2006 WL 2714961 at *1 (W.D.Mich., Sept. 22, 2006). At the time plaintiff filed his complaint, the court determined that he was not in violation of the three strikes rule. The court has no basis to upset the *in forma pauperis* determination based upon dismissals that occurred after plaintiff filed suit. *See id.* (in rejecting the defendants' claim that the three strikes rule applied, the court observed that "[p]laintiff did not have three strikes at the time he filed his complaint").

### IV.     Plaintiff's Eighth Amendment claims

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws.  *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984);  *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law.  *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under 42 U.S.C. § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment.  *Estelle v. Gamble*, 429 U.S. 97 (l976).   A viable Eighth Amendment claim consists of an objective and a subjective component.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The objective component requires a plaintiff to "allege that the medical need is 'sufficiently serious.'"  *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001), *quoting Farmer*, 511 U.S. at 834.  The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety.  *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).  To establish the subjective component, deliberate indifference, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. Thus,

> a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

*Estelle*, 429 U.S. at 106.

"[A] plaintiff alleging deliberate indifference must show more than negligence or the misdiagnosis of an ailment." *Comstock*, 273 F.3d at 703. *See Clemmons v. Bohannon*, 956 F.2d 1523, 1529 (10th Cir. 1992) ("the Eighth Amendment does not apply to claims based on inadvertent failure to provide adequate care, negligent misdiagnosis, or an inmate's difference of opinion with medical personnel regarding diagnosis or treatment"). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n. 5 (6th Cir. 1976). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.* "When a prison doctor provides treatment, albeit carelessly or inefficaciously, to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs, but merely a degree of incompetence which does not rise to the level of a

constitutional violation." *Comstock*, 273 F.3d at 703. However, in some cases, the medical attention may be so "woefully inadequate" as to amount to no treatment at all. *Westlake*, 537 F.2d at 860 n. 5. *See also, Terrance v. Northville Regional Psychiatric Hospital*, 286 F.3d 834, 844 (6th Cir. 2002) (when a medical condition poses a serious need for treatment, the question for the court is whether the care provided was "so grossly incompetent, inadequate, or excessive as to shock the conscious or to be intolerable to fundamental fairness") (internal quotations omitted).

### A. Plaintiff's affidavit

In the affidavit attached to his motion for summary judgment, plaintiff limits his claims against Dr. Kilpatrick to events that occurred on June 2nd, 4th and 7th, 2004. *See* Plaintiff's Affidavit (July 17, 2006) (docket no. 113). Plaintiff's affidavit contains the following statements. He suffered a "brain aneurysm rupture" on June 2, 2004 between 1:45 a.m. and 11:30 a.m. Plaintiff's Aff. at ¶ 1. Plaintiff cites no medical record to support his determination, having reached this conclusion through his own "back date research." *Id.* at ¶ 7. At that time, he had nausea, was light-headed, had very poor eyesight, and the left side of his body was paralyzed and numb. *Id.* at ¶ 3. Plaintiff saw Dr. Kilpatrick, "sometime around 12:15 p.m." and told him the following symptoms: "headache that's beyond belief, whole left side of body paralyzed and numb, very poor eye sight, weakness, neck stiffness and feel like vomiting." *Id.* at ¶¶ 3, 7. The doctor asked if anything like this had happened before, and prison personnel brought up the December 30, 2003 incident. *Id.* at ¶ 3. Two corrections officers told the doctor that he "was faking and playing games" and to "disregard" him. *Id.* at ¶ 4. Plaintiff told Dr. Kilpatrick that he was "having a stroke." *Id.* at ¶ 4.

Plaintiff was vomiting from June 2, 2004 through June 8, 2004. *Id.* at ¶ 5. Dr. Kilpatrick prescribed pain medication. *Id.* Plaintiff denies that Dr. Kilpatrick saw him on June 3, 2004. *Id.* at ¶ 6. Dr. Kilpatrick did see him on June 4, 2004. *Id.* at ¶ 7. At that time, plaintiff had the following symptoms: a swollen eye; clumsiness, problems eating; severe headache; vomiting; numbness in the head, face, arms, hands, hips, legs, back and feet; weakness; jerking movements; speech problems; poor awareness; brief blackouts; and sluggishness. *Id.* at ¶ 9. Dr. Kilpatrick made jokes about plaintiff's swollen eye. *Id.* at ¶ 9. Dr. Kilpatrick made no attempt to see him after June 4th. *Id.* at ¶ 11. Based on these facts, plaintiff states that Dr. Kilpatrick knew of a substantial risk to his health and safety. *Id.* at ¶ 14.

Plaintiff's affidavit contradicts his earlier declaration made under penalty of perjury that he "was never seen by Rodney L. Kilpatrick June 4, 2004," that he was seen by Dr. Kilpatrick on June 5, 2004, and that Dr. Kilpatrick deliberately changed medical records. Declaration at ¶ 14 (docket no. 49). Plaintiff's affidavit also contradicts the allegations set forth in his own complaint that Dr. Kilpatrick treated him on June 5th and that the doctor called him out for treatment on June 7th. Amend. Compl. at pp. 11-13.

**B.     Dr. Kilpatrick's affidavit**[1]

Dr. Kilpatrick makes the following statements in his affidavit. He had no involvement with plaintiff on December 30, 2003. Kilpatrick Affidavit at ¶ 3 (docket nos. 109 and 110). He examined plaintiff on June 2, 2004. *Id.* at ¶ 4. At that time, plaintiff complained of a headache posteriorly with sudden onset. *Id.* Plaintiff claimed he was going to vomit, but did not.

---

[1] Plaintiff contests Dr. Kilpatrick's affidavit because it is unsigned. The court notes that the affidavit was filed in accordance with the court's local rules. *See* docket nos. 109 and 110.

*Id.* Plaintiff denied prior episodes, but custody staff suggested he had a prior incident. *Id.* Dr. Kilpatrick denies that plaintiff made the statement that "I had a stroke and I need to get to a hospital before I die." *Id.* at ¶ 5. Dr. Kilpatrick also denies that anyone told him that plaintiff "is faking and playing games." *Id.*

> Dr. Kilpatrick described his treatment of plaintiff on June 2nd as follows:
>
> On June 2, 2004, I assessed Mr. Harris as having a possible headache, with no sign of a CVA ("cerebrovascular accident"), or stroke. Mr. Harris was informed of the lack of findings, encouraged that "everything appeared intact" and told to walk back to his cell with assistance after being given three acetaminophen. I noted in the medical file that Mr. Harris' "gait got better the farther down the hall he went w/Custody." I ordered any new changes be reported and routine observation of Mr. Harris.

*Id.* at ¶ 7.

> Dr. Kilpatrick described his treatment of plaintiff on June 3rd as follows:
>
> On June 3, 2004, I saw Mr. Harris again and noted he still had complaints of a headache, and that he had a low grade fever the previous evening, having thrown up twice. Mr. Harris had no further symptoms like the prior day. I noted Mr. Harris was hard to evaluate as he gave a variable history. The Toradol, 60 mg I had ordered given to Mr. Harris he claimed brought no relief, but he claimed that the Imitrex, 50 mg I had ordered had given him some relief. Both afternoon nurses believed Mr. Harris looked better. Mr. Harris had no neurological deficits. I assessed Mr. Harris with a headache, and viral flu versus a migraine versus intracranial etiology, with the question-marked notation of aneurysm. My plan was to try Imitrex for three days, and to get a MRI of the head with contrast if he worsened, with nurses checking Mr. Harris each shift.

*Id.* at ¶ 8.

> Finally, Dr. Kilpatrick described his June 4th treatment of plaintiff as follows:
>
> On June 4, 2004, I examined Mr. Harris and noted that he claimed weakness in his left leg, that he could not walk, and that his entire lower left extremity was numb. Mr. Harris was alert and oriented. I found an examination of Mr. Harris' eyes to be normal, and his respiratory and cardiovascular systems normal. I found his hips, knees, feet and ankles normal. I found no weakness in the lower left extremity. While Mr. Harris at first did not fully cooperate for the examination, he

9

> did cooperate when "firmly encouraged." Mr. Harris' sensory function, coordination, balance and gait, cranial nerves, tendon reflexes, and muscle strength were normal.
>
> \*   \*   \*
>
> On June 4, 2004, I again saw Mr. Harris. I noted Mr. Harris still had a posterior, central headache, that varied in intensity but had not gone away. Imitrex was of some help. Mr. Harris had vomited four times since the onset of the headache, and he was no longer running a fever. Mr. Harris stated he had a sudden onset of pain while making his bed and lifting his head quickly, getting an "electric shock" feeling. The "shock" cause local pain then a stiff neck. Dr. Kilpatrick [sic] found no peripheral signs or symptoms. Mr. Harris was alert and oriented, but afraid, apparently fearing a tumor or aneurysm. Mr. Harris looked better, his color was better and his gait normal. On examination of his head/neck I found some muscles tight, which I believed was from a greater occipital nerve pinch. I found negative Budzinksi and Kernig signs, and noted Mr. Harris' scalp tingled at times. Mr. Harris' eyes were normal, except for mild blurred vision at times, and found his respiratory and cardiovascular systems normal. His musculoskeletal and neurological systems were normal, including coordination, gait, reflexes and muscle strength. I assessed preliminary diagnoses of greater occipital neuralgia and intracranial aneurysm, although I questioned the second diagnosis. I found Mr. Harris' presentation compatible with his history, and prescribed Ultram and a Tigan suppository for pain and nausea. Again, I planned to get a MRI of the head with contrast as soon as possible if he worsened.

Kilpatrick Aff. at ¶ ¶ 6, 9.

Dr. Kilpatrick did not examine plaintiff after June 4th. *Id.* at ¶ 10. The doctor denied that he made jokes about plaintiff's swollen eye. *Id.* at ¶ 11. Finally, Dr. Kilpatrick was not informed that plaintiff wanted to see him on June 7, 2004 . *Id.* at ¶ 12.

### C.     Discussion

The parties agree that Dr. Kilpatrick treated plaintiff on June 2nd and 4th. Plaintiff denies that Dr. Kilpatrick treated him on June 3rd. However, the medical records reflect that Dr. Kilpatrick examined him on that date. As the court observed in the previous report and recommendation:

10

> On June 3, 2004, at 1:51 p.m., plaintiff complained to non-party Nurse Jensen that he had a headache and nausea and was not eating. [*See* Medical Records (docket no. 67)]. The nurse found plaintiff's gait steady and that he had no deficits and his speech was clear. *Id.* She received orders to give him Toradol. *Id.* At 3:09 p.m. the nurse spoke to plaintiff on the phone. *Id.* He reported little relief from the injection and that he vomited again. *Id.* Nurse Jensen made the doctor aware of plaintiff's status. *Id.* Dr. Kilpatrick examined plaintiff at 4:54 p.m. *Id.* He found that plaintiff was a "hard inmate to evaluate": plaintiff stated that the Toradol gave no relief, that Imitrex had given some relief, that both the p.m. nurses thought plaintiff looked better, and that there were "[n]o neuro deficits." *Id.* The doctor's assessment included a headache and the following possibilities: "Viral flu vs migraine vs intracranial etiology (aneurysm??)". *Id.* The doctor listed the following plan: "Try Imitrex for 3 days. Get Head MRI w/contrast if worsens. RN's to check on him per shift." *Id.* The records reflect that plaintiff was prescribed two tablets of Imitrex, three times per day for three days. *Id.*

Report and Recommendation at 12 (footnote omitted) (docket no. 100). While plaintiff states that Dr. Kilpatrick did not treat him on June 3rd, he presents no credible argument or evidence to contest the accuracy of the entries in his medical records, which clearly reflect that the doctor treated him on that date. Accordingly, there is no genuine issue with respect to the fact that plaintiff saw the doctor on June 3rd.

Plaintiff's claim boils down to whether Dr. Kilpatrick's actions constitute deliberate indifference to plaintiff's serious medical needs. Plaintiff has presented evidence to demonstrate that he suffered from a sufficiently serious medical need. Dr. Kilpatrick's own treatment notes reflect a possible diagnosis of aneurysm.

However, viewing the facts in the light most favorable to plaintiff, the court concludes that Dr. Kilpatrick was not deliberately indifferent to this serious medical need. The evidence establishes that Dr. Kilpatrick examined plaintiff three times (June 2nd, 3rd and 4th), prescribed medication and monitored his progress. This court is reluctant "to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860

11

n. 5. The issue before the court is whether Dr. Kilpatrick's care was so woefully inadequate or grossly incompetent as to shock the conscious or to be intolerable to fundamental fairness. *See Terrance*, 286 F.3d at 844; *Westlake*, 537 F.2d at 860 n. 5.

The record reflects that Dr. Kilpatrick considered the possibility of an aneurysm and planned to order an MRI if plaintiff's condition worsened. As the court discussed in the previous report and recommendation, the medical records did not reflect a change in plaintiff's medical condition until he became unresponsive on June 7th:

> On June 4th, non-party Nurse Jensen examined plaintiff at 11:30 a.m., found that plaintiff had no relief from medication, had a "stiff neck appearance" but was alert and oriented. [*See* medical records (docket no. 67.] Dr. Kilpatrick examined plaintiff at 2:08 p.m. *Id.* Plaintiff reported that he lifted his head quickly while making the bed and felt an "electric shock" on his head. *Id.* Plaintiff still reported a headache. *Id.* The doctor found plaintiff alert and looking better, but anxious and afraid, fearing a tumor or aneurysm. *Id.* The doctor believed plaintiff had greater occipital nerve pinch. *Id.* However, his preliminary diagnosis included (1) "Greater Occipital Neuralgia" and (2) "Intracranial Aneurysm???" *Id.* The doctor noted that plaintiff's history was compatible with his presentation, added Ultram and Tigan for the pain and nausea. *Id.* The doctor also included an "MRI brain w/contrast asap" if plaintiff's condition worsened. *Id.*
> 
> Nurse Bookheimer examined plaintiff at 6:15 p.m. but observed little improvement *Id.* He visited plaintiff at 8:00 p.m., at which time plaintiff stated that he felt much better and smiled. *Id.* Plaintiff was instructed to keep drinking fluids and to contact the Health Center immediately if symptoms increased. *Id.*
> 
> Neither plaintiff nor defendant have provided medical records for June 5th or 6th (Saturday and Sunday). For his part, plaintiff contends that he was examined by Dr. Kilpatrick on June 5th, that he was not seen by the doctor on June 4th and that the medical records were deliberately altered to show the wrong date. Plaintiff's Declaration I at ¶ 14. Plaintiff's uncorroborated assertion that Dr. Kilpatrick intentionally altered his medical records to reflect a date of June 5th rather than June 4th appears incredible, in light of other medical records which reflect that the doctor prescribed Tigan and Ultram on that date. *See* Medical Records (sealed).
> 
> Plaintiff did not allege any medical problems or interaction with health care providers on June 6th.

>		The medical records reflect that on June 7th, at 7:46 a.m., non-party Nurse Briske observed that plaintiff's right eyelid was swollen shut. *Id.* Plaintiff reported that his headache continued without relief but there was no report of vomiting. *Id.* Nurse Briske noted that "[c]ustody reports inmate monitored by day RN during weekend [i.e., June 5th and 6th]." *Id.* Later that night, Nurse Bookheimer examined plaintiff at 7:00 p.m., noting that his right eyelid was swollen. *Id.* Plaintiff reported that he felt somewhat better, was eating meals, and answered questions appropriately. *Id.* Plaintiff was instructed to place a cold compress on his eye. *Id.* At 9:00 p.m., plaintiff told the nurse that he did not need to see him. *Id.* Then, at 9:20 p.m., plaintiff was reported to be lying on the floor unresponsive. *Id.* Nurse Bookheimer examined plaintiff and sent him to the hospital via ambulance. *Id.*

Report and Recommendation at 12-14 (docket no. 100).

	The medical records reflect that plaintiff had no complaints on June 5th and 6th. His medical condition worsened on June 7th, but plaintiff gave conflicting statements regarding his condition. When plaintiff was unresponsive, he was sent to the hospital in an ambulance.

	This is not a case where plaintiff's treatment amounted to "no treatment at all." Plaintiff saw Dr. Kilpatrick three times. Plaintiff presented numerous symptoms and a complicated medical history. The doctor treated plaintiff's symptoms and monitored his condition. In Dr. Kilpatrick's opinion, plaintiff did not exhibit symptoms that required an immediate MRI study. Plaintiff may disagree with Dr. Kilpatrick's decision not to order an MRI study on June 2nd, 3rd or 4th. However, the doctor's decision not to order an MRI study does not, in and of itself, establish deliberate indifference. A plaintiff's failure to receive the level of health care that he desires does not present a constitutional claim. *See generally, Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 384 (6th Cir. 2004); *Westlake*, 537 F.2d at 860, n.5. "A patient's disagreement with his physicians over the proper medical treatment alleges no more than a medical malpractice claim, which is a tort actionable in state court, but is not cognizable as a federal constitutional claim." *Owens v. Hutchinson*, No. 03-1402, 2003 WL 22434571 at *2 (6th Cir. Oct.

13

24, 2003), *citing Street*, 102 F.3d at 816 n. 13; *Sanderfer v. Nichols*, 62 F.3d 151, 154-55 (6th Cir. 1995); *Westlake*, 537 F.2d at 860 n. 5.

Furthermore, plaintiff's assertions that corrections officers told the doctor that plaintiff was faking and that the doctor joked about his swollen eye are insufficient to establish deliberate indifference. The medical record demonstrates that plaintiff received medical attention for his swollen eye and his other symptoms. Assuming that defendants made these remarks, such statements do not establish deliberate indifference, i.e., that Dr. Kilpatrick knew of and disregarded an excessive risk to plaintiff's safety. *See Farmer*, 511 U.S. at 837.

It is tragic that plaintiff suffered a subarachnoid hemorrhage. In hindsight, armed with the knowledge that plaintiff suffered this injury, one could criticize Dr. Kilpatrick's diagnosis and treatment. It is possible that other physicians would disagree with his course of treatment. However, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106. The undisputed record reflects that Dr. Kilpatrick evaluated and treated plaintiff for the symptoms presented. The doctor did not rule out the possibility of an aneurysm. Plaintiff appears to have improved after he saw Dr. Kilpatrick on June 4th. The doctor's treatment of plaintiff was not "so grossly incompetent, inadequate, or excessive as to shock the conscious or to be intolerable to fundamental fairness." *Terrance*, 286 F.3d at 844.

Accordingly, the court concludes that Dr. Kilpatrick did not act with deliberate indifference to plaintiff's serious medical need.

### V. RECOMMENDATION

I respectfully recommend that defendant Dr. Kilpatrick's motion for summary judgment (docket no. 109) be **GRANTED** and that plaintiff's motion for summary judgment (docket no. 112) be **DENIED**.


Dated: January 9, 2007                     /s/ Hugh W. Brenneman, Jr.
                                          Hugh W. Brenneman, Jr.
                                          United States Magistrate Judge



ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within ten (10) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).